ETHEL BURGE, APPELLEE, v. C. F. ADAMS COMPANY,
                         APPELLANT.

FILED MARCH 13, 1915.   No. 17995.

Appeal: REVERSAL. "A verdict so clearly wrong as to induce the be-
lief on the part of the reviewing court that it must have been
found through passion, prejudice, mistake, or some means not
apparent in the record, will be set aside and a new trial awarded."
*Garfield v. Hodges & Baldwin*, 90 Neb. 122.

APPEAL from the district court for Douglas county:
LEE S. ESTELLE, JUDGE. *Reversed.*

*Morsman, Maxwell & Thompson*, for appellant.

*Lambert, Shotwell & Shotwell*, contra.

FAWCETT, J.

This action was instituted in the district court for
Douglas county to recover damages which plaintiff claims
to have sustained as the result of fright occasioned by an
assault with a revolver. The jury returned a verdict in
favor of plaintiff for $1,933, upon which judgment was
entered, and defendant appeals.

The record shows that defendant is a corporation en-
gaged in the sale of household goods upon the instalment
plan. Plaintiff purchased some quilts on that plan, agree-
ing to pay 25 cents a week on the purchase price. At the
time of the alleged assault she was in arrears for three or
four weeks' payments. One Grabill, a collector for de-
fendant, called at her apartments to collect her past-due
payments. The house appears to have been a duplex house,
plaintiff's mother and sister living on the first floor, and
plaintiff, with her husband and family, occupying the sec-
ond floor. Plaintiff testified that she saw Grabill ascend-
ing the stairs, and met him at the top and before he had
quite reached the landing. Being told by him the pur-
pose of his call, she told him that she did not have the
money that week on account of the recent death and burial

of the baby.  Grabill told her that he had to have payments on the things, "and I says, 'You won't.'"  This precipitated an altercation between them.  Grabill said he must have the payments or the quilts.  She replied, "No; you won't take the goods," and started away from him. She says he told her to "halt," and that when she turned around he pulled a revolver, pointed it at her and said "he would fix" her.  Grabill denied this, and testified that he did not have a revolver, but that when she had called him the name which, when used between men, usually results in a fight, and her mother and sister appeared at the foot of the stairs, he placed his hand upon his hip pocket as a bluff so as to enable him to make his escape.  The above is a very brief statement of what transpired at the time the assault is alleged to have been made, but it is sufficient to show the character and extent of the assault, if one were made.  When both sides had rested, defendant requested the court to instruct the jury to return a verdict for defendant, which request was overruled.

Conceding, without deciding, that the evidence was sufficient to take the case to the jury on the question of whether or not an assault had been committed as alleged, we are next confronted with defendant's assignment of error that "the verdict of the jury is so excessive as to clearly show that it was the result of passion and prejudice."  The testimony as to the extent of plaintiff's injury was given by herself, her mother and her husband. Plaintiff testified that when Grabill "pulled the gun on her" she thought he was going to kill her and became very nervous; that immediately after he left she went to bed; that after lying down she was jerking, crying and nervous; that she was frightened; that she remained in bed for a week, nervous and weak; that a physician attended her during the week; that after a week she was able to be up for a while; was up and down; that this condition continued for four or five days; that the nervous condition was still with her at the time of the trial; that she had not been well since the assault; that she had not been nervous prior thereto.  Her mother testified that after

Grabill left she went up stairs and found plaintiff in bed; that she attended her; that she was "awfully" nervous and was crying; that she quieted her down as much as she could; that she sent for a doctor twice that evening; the first time they were unable to get him, so they made the second call; that she was "awfully bad," and remained in bed for about eight days; "of course, she would sit up, but she could not stay up for quite a while at a time, because she was so nervous;" that she had nervous headaches all the time; that she shook pretty near all the time except when they would be talking to her; that she cried off and on; had spells of crying all the evening, all the rest of the day and all the evening; after she got up from bed she was still nervous; that she called plaintiff's husband about 4 or 5 o'clock that afternoon. The husband testified that he was called home about 5 o'clock; when he got there his wife was lying in the apartment; was nervous and seemed to be in pretty bad shape; was crying and said she came pretty near getting shot; her condition was a nervous breakdown; summoned a physician; she was confined to her bed for over a week; she suffered a nervous breakdown; had headaches; before that her health had been good; "she never was right after that, or hasn't been up to the present time; * * * she was a little better at times, of course, and then, if she would have any excitement or other thing, it would cause her another breakdown; she would have to go back to bed again."

This is all of the testimony offered as to the nature and extent of plaintiff's injuries. It shows that they called a physician, who, plaintiff testified, attended her for a week. This physician was not called as a witness, nor any reason assigned why he was not called. There is no evidence to show that after plaintiff left her bed, about eight days after the alleged assault, she was not able to perform all of her regular duties, or that she suffered in any way except from occasional spells of nervousness. Plaintiff testified that at the time of the trial (December, 1912) she was 20 years of age; that she had three children living; one, a babe born October 26, another three, and the

other six years old; that about ten days before the time of the assault, on February 13 of that same year, they had buried still another child, who at that time was six months old. This testimony shows that when plaintiff gave birth to her first child she was only 14 years of age; that at the time of burying the six months' old child on February 3, 1912, she was pregnant with the babe born October 26. We think it is not surprising that she may have had spells of nervousness during those eight months. The jury returned a verdict in favor of plaintiff for $1,933. This verdict, under the evidence above outlined, is so grossly excessive that we see no escape from appellant's contention that it was not based upon the evidence in the case, but was the result of passion and prejudice. This appears to us to be so clearly a case where passion, prejudice, mistake, or some means not appearing in the record controlled the jury that we cannot permit the verdict to stand. Our conclusion upon this point renders it unnecessary for us to consider any of the other questions presented and argued.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

MORRISSEY, C. J., ROSE and HAMER, JJ., not sitting.