GEORGE THOMAS ISKE, APPELLEE AND CROSS-APPELLANT, IMPLEADED WITH GLADYS E. ISKE ET AL., APPELLEES AND CROSS-APPELLEES, v. METROPOLITAN UTILITIES DISTRICT OF OMAHA, APPELLANT AND CROSS-APPELLEE.

157 N. W. 2d 887

Filed April 12, 1968. No. 36558.

Cecil S. Brubaker, Willis L. Strong, and James F. Begley, for appellant.

Crosby, Pansing, Guenzel & Binning, Harold R. Leb-

ens, and Walter, Albert, Leininger & Grant, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

WHITE, C. J.

This is a proceeding in eminent domain. The defendant, Metropolitan Utilities District of Omaha, which furnishes water service to the metropolitan area of Omaha, Nebraska, is constructing a well field adjacent to the Platte River south of Omaha. As a part of that project, the defendant condemned a 284-acre tract of land owned by the plaintiff, George Thomas Iske.

The Iske tract contains Cedar Island, which has an area of 173 acres and is approximately $1\frac{1}{4}$ miles in length, and river-bed land amounting to 111 acres. Cedar Island is separated from the north bank of the Platte River by a narrow chute or waterway. Cedar Island is subject to a gravel lease owned by the Gerhold Company, a corporation

The appraisers appointed by the county judge awarded $190,380 to the plaintiff and $36,660 to the Gerhold Company. The plaintiffs' Iske and the defendant separately appealed to the district court where the appeals were consolidated. The issue tried there was the fair market value of the land and leasehold taken by the defendant. The jury returned a verdict for the plaintiff in the amount of $510,150, and for the Gerhold Company in the amount of $26,850. The defendant's motion for new trial was overruled and it has appealed.

The evidence shows that the highest and best use of Cedar Island is for the production of sand and gravel followed by use for recreational purposes. There is sand and gravel to a depth of approximately 50 feet under Cedar Island with an overburden of from $1\frac{1}{2}$ to 3 feet. The sand and gravel deposit could also be used to supply a large volume of water for industrial purposes. The area in Sarpy County immediately north of Cedar Island is zoned for industrial use.

The plaintiff produced two expert witnesses who testified that in their opinion the fair and reasonable market value of the Iske land was between $825,000 to $925,000, and $1,500,000 respectively. The defendant later moved to strike this testimony. The rulings on the motions to strike and on other objections made to this evidence are the basis for the defendant's principal assignments of error.

The plaintiff's first expert witness, Glenn Chase, testified that he had made a detailed study of the Cedar Island area and of the real estate sales in Cass and Sarpy Counties; and that there were no comparable sales of real estate which could be used as the basis for an appraisal. He based his appraisal upon an "income approach." The parties stipulated that the opinion testimony of this expert witness was not based on the "prices of other sales of property."

Chase testified that he considered that the gravel would be exhausted in 12 years; that he computed an annual income by applying the royalty specified in the Gerhold Company lease to this estimate of the gravel which would be produced each year; and that he then applied a "discount or capitalization rate" of 7 percent (factor 7.943) to arrive at the value of this income. He further considered that Cedar Island would be available for recreational use after the gravel had been removed; that he computed an annual income from this use by assuming that there would be 232 lots to be rented and applying a rental rate of $2 per front foot less an amount for "Losses and administration"; and that he then applied a discount factor to this amount to obtain a present value of this income.

The plaintiff's second expert witness, F. Pace Woods, considered the possibility of industrial use as well as sand and gravel production and recreational use. In valuing the property for sand and gravel production, Woods testified that he considered that it would yield a royalty in excess of $1,000,000. In valuing the prop-

erty for recreational use he testified that he used the "income method" although his testimony does not show any computations used in arriving at a value. His opinion as to its value for industrial uses was based upon the factors that he considered necessary for industrial property.

The defendant contends that the testimony of the plaintiff's expert witnesses should have been stricken because their testimony was, in part, based upon an improper measure of damages. The defendant argues that these expert witnesses should not have been allowed to testify concerning the quantity of sand and gravel available and the royalty rate specified in the Gerhold Company lease.

Where land taken by eminent domain has valuable deposits of gravel, this circumstance may be considered so far as it may affect the market value of the land, but part of the realty cannot be separately valued for its materials as an item in addition to the market value of the land. Pieper v. City of Scottsbluff, 176 Neb. 561, 126 N. W. 2d 865; Medelman v. Stanton-Pilger Drainage Dist., 155 Neb. 518, 52 N. W. 2d 328. Evidence may be received to show that the lands involved contain gravel deposits that are adaptable to commercial development and the fair market value of the lands in view thereof.

An expert witness may consider the quantity of a mineral in place of its unit price as a factor in determining the fair market value of the land. Pieper v. City of Scottsbluff, supra; United States v. Land in Dry Bed of Rosamond Lake, 143 F. Supp. 314; State Highway Commission v. Nunes, 233 Or. 547, 379 P. 2d 579. An expert witness may be permitted to use and testify to the factors which a well-informed buyer would use in arriving at the price he would pay for the property. Clark v. United States, 155 F. 2d 157.

The record in this case indicates that the plaintiff's expert witnesses did not value the sand and gravel in place as an item separate from the value of the land, but

used this information as a factor in arriving at the value of the land.

In determining the value of the plaintiff's land, after the production of sand and gravel had been completed, at least one of the plaintiff's expert witnesses assumed that the property would be developed in accordance with a plan that had been described by a previous witness, John J. Thompson.

Thompson is a civil engineer who has had experience in planning and developing property for recreational use. He testified that he was familiar with Cedar Island and had prepared a design for development of recreational lots on the island. Exhibit 16, which was received over objection, is a design or preliminary plat prepared by Thompson. It is an overlay, drawn over an aerial photograph of Cedar Island. The admission of exhibit 16 is assigned as error.

As a general rule, exhibits which are practically instructive to explain the evidence or aid in its interpretation or application by the jury may be admitted. Dawson v. City of Lincoln, 176 Neb. 311, 125 N. W. 2d 908.

But giving defendant's objection its maximum range, the exhibit is challenged as being irrelevant because it is speculative, conjectural, and highly prejudicial. The determination of this question overlaps and partially embraces the larger question of the admissibility of the testimony of the expert witness Glenn Chase as to the capitalization of income on the recreational and residential lots as being a relevant factor in the determination of the present market value. In approaching this question we must remember that a direct issue was drawn in this case as to whether Cedar Island could reasonably be developed into a residential or recreational area. Was it a reasonably prospective use of the property? The plaintiff had alleged, and the defendant denied, that Cedar Island was "peculiarly adapted to development into a recreational area." The plaintiff was attempting to show that a reasonably prospective use of Cedar Island would

be its development for recreational purposes after sand and gravel production had been completed and that this factor would affect the considerations influencing the present market value of the property. The resolution of this question was primarily for the jury under conflicting issues and evidence, and should be decided like any other question of fact at issue in a case. It is not for the court to determine under the guise of a determination of the admissibility of evidence. In Medelman v. Stanton-Pilger Drainage Dist., *supra,* this court held that in a condemnation proceeding, where evidence was conflicting as to adaptability of lands for a prospective use, it was a fact issue for the jury to determine under the evidence. This court said in that case as follows: "If, by reason of its surroundings, or its natural advantages, or its artificial improvements, or its intrinsic character, it is peculiarly adapted to some particular use, all the circumstances which made up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating compensation." The evidence shows that the witness Chase is an expert appraiser who spent approximately 36 days and made an exhaustive examination of the land, zoning regulations, and many other factors relevant to the determination of whether this land had a prospective use for recreational or residential lot purposes. Exhibit 16 was no more than an illustration and a depiction in graphic form of the logical development of this testimony. If the prospective use was a relevant consideration, a graphic portrayal of the plan of such use was also relevant. The exhibit does not overreach the scope of the oral testimony. It particularizes, explains, and serves to establish the accuracy and credibility of the expert witnesses' testimony. Such an exhibit would be highly relevant on cross-examination. We can see no reason why it could not be introduced on direct examination. In considering this question we observe that the expert witnesses for both the plaintiff and the defendant are in agreement that this island, both in

its present and future state after the development of lakes, had recreational possibilities. From the evidence the jury, therefore, could reasonably infer that the development for recreational or residential lot purposes is a prospective use which, in turn, is a factor that affects the present market value of the property. See, 27 Am. Jur. 2d, Eminent Domain, § 280, p. 70; Medelman v. Stanton-Pilger Drainage Dist., *supra;* Pieper v. City of Scottsbluff, *supra;* Langdon v. Loup River Public Power Dist., 144 Neb. 325, 13 N. W. 2d 168.

We are aware that there is considerable authority supporting the holding that such a plat or exhibit is not admissible in evidence. See, 5 Nichols (3d Ed.), Eminent Domain, § 18.11(2), pp. 159, 160, 161; State Highway Commission v. Deal. 191 Or. 661, 233 P. 2d 242; Earl M. Kerstetter, Inc. v. Commonwealth, 404 Penn. 168, 171 A. 2d 163. But the recent cases hold that such evidence is admissible on the issue of the suitability of the tract for subdivision purposes, which, as we have pointed out, was a direct issue in this case. Arkansas-Louisiana Gas Co. v. Lawrence, 239 Ark. 365, 389 S. W. 2d 431; Commonwealth Dept. of Highways v. Denny (Ky. App), 385 S. W. 2d 776; State Highway Commission v. Conrad, 263 N. C. 394, 139 S. E. 2d 553, 12 A. L. R. 3d 553; Cherokee Pipe Line Co. v. Jury (Okla.), 393 P. 2d 503; Hawaii Housing. Authority v. Rodrigues, 43 Hawaii 195. Such evidence is admissible even in the jurisdictions that hold generally that such a plat or evidence is not admissible, when there is an issue of the suitability of the tract for subdivision purposes in the case. State Highway Commission v. Deal, *supra;* Forest Preserve Dist. v. Krol, 12 Ill. 2d 139, 145 N. E. 2d 599. There is both disagreement and diversity of approach in the authorities on this problem. However, much of the confusion can be resolved by pointing out that such evidence is inadmissible as speculative and conjectural when the only showing is that the property *could* be used for subdivision purposes. Where, on the other hand, as here, the use for

subdivision purposes is not merely speculative and not too remote to influence present market value, such evidence is admissible. See, 29A C. J. S., Eminent Domain, § 273 (2), p. 1197; Arkansas State Highway Commission v. O. & B., Inc., 227 Ark. 739, 301 S. W. 2d 5; Santa Clara County Flood Control & Water Conservation Dist. v. Freitas, 177 Cal. App. 2d 264, 2 Cal. Rptr. 129; Oakley v. State (Tex. Civ. App.), 346 S. W. 2d 943, 163 Tex. 463, 356 S. W. 2d 909, 95 A. L. R. 2d 1207; Buena Park School Dist. of Orange County v. Metrim Corp., 176 Cal. App. 2d 255, 1 Cal. Rptr. 250.

We now consider the problem of the competency of the valuation testimony of plaintiff's expert witnesses with reference to its use as a residential and recreational area. Again, this question overlaps the previous one discussed. Chase was an expert appraiser, had made a thorough inspection of the property, and testified in detail as to the various factors he took into consideration in valuing the property, both from the standpoint of the gravel deposits and of its use for recreational and subdivision purposes. It is stipulated there were no comparable sales. That being true, this witness used the "income approach." He computed the annual income from this use by assuming there would be 232 lots to be rented and applying a rental rate of $2 per front foot less an amount for "Losses and administration"; and then he applied a discount factor to this amount to obtain a present value of this income. The result he reached was not considered by him as a separate value of the property but as a factor that was taken into consideration in determining the present market value that he testified to was between $825,000 to $925,000. That capitalizing of an estimate of the net rents of a probable use of the property is an accepted method of valuation cannot be questioned. 27 Am. Jur. 2d, Eminent Domain, § 286, p. 87; 4 Nichols (3d Ed.), Eminent Domain, § 13.22, p. 418.

This testimony on behalf of the expert witness Chase came in without objection on the part of the defendant,

without any cross-examination of the witness as to foundation, and was not objected to until after this witness had been cross-examined. Whatever the rule may be in other jurisdictions, the rule in this state is that either lay or expert witnesses may be used to testify as to the value of a tract of land taken, or the value of the remainder thereof immediately before and immediately after the taking, if proper foundation is laid showing they have an acquaintance with the property and are informed as to the state of the market, *the weight and credibility of their testimony being for the jury.* Medelman v. Stanton-Pilger Drainage Dist., *supra;* Langdon v. Loup River Public Power Dist., *supra;* Wahlgren v. Loup River Public Power Dist., 139 Neb. 489, 297 N. W. 833. In the Medelman case we said: "What a witness considers in coming to his conclusion as to the value thereof can be brought out in cross-examination." It would seem, therefore, under the clear holdings in our cases, and there is no contention here that we should narrow it, that an expert witness once qualified may testify as to valuation, and that the weight and credibility of what the expert witness considers in coming to his conclusion as to value at the time of the taking, are matters for the jury to determine. Weight to be given to such expert testimony, assuming his proper qualifications and his examination of the property, is ordinarily a question for the jury. Jurors are not bound by the testimony of expert witnesses. Their evidence is to be weighed as that of all other witnesses. Langdon v. Loup River Public Power Dist., *spura;* Medelman v. Stanton-Pilger Drainage Dist., *supra;* McNaught v. New York Life Ins. Co., on rehearing, 143 Neb. 220, 12 N. W. 2d 108. We are aware of cases from other jurisdictions that vary from this holding, but the above holding is the law of the State of Nebraska and we see no reason for a departure therefrom. Our rule in condemnation cases in this state is consistent with that in other areas of litigation where it is well established that the data and reasoning upon which an expert

witness relies is admissible to the jury. And, as we have seen, the assumptions upon which Chase's valuation testimony is based, mainly, the probable and available use of the property for recreational and subdivision purposes, and its division into component units for that purpose, were submitted to the jury under competent evidence and furnish a basis for this testimony. We fully realize that there is a diversity of cases and confusion on this subject in the reported authorities. Many of these variations result from the application of different statutes and the application of different basic principles regarding the admission of expert testimony in condemnation cases. The cases, passing upon the question of whether the capitalization of income method may be applied by the multiplication of a unit rental value or sale price, follow three different patterns. There are cases holding that the multiplication unit method of capitalizing income may not be used at all. Some cases hold that it may be used but that the expert witness may not, on direct examination, testify as to the quantity and price per unit of the land or materials involved. And, third, some cases hold that the expert witness may not only use the multiplication method but he may also explain specifically how he used it by referring to the quantity and the price per unit and the data and evaluation methods employed. All courts agree, and of course the rule has been complied with here, that if the capitalization of income method is used by applying it to the multiplication of the different units of income, such a result cannot be taken as the value of the land but must be used only as a factor in evaluating the present market value of the land itself. See, Medelman v. Stanton-Pilger Drainage Dist., *supra;* Pieper v. City of Scottsbluff, *supra.*

Defendant complains in this case that various costs and expenses and other factors that should have been considered as a foundation for Chase's testimony were not considered by him. The essence of this complaint is that Chase failed to take into consideration the cost of the

development for recreational purposes and that, therefore, his capitalization of "income approach" was inadmissible. The difficulty of this argument is: First, that most of this testimony was brought out on cross-examination and there was no objection to the expert witness' direct testimony; and, second, and more important, the expert witness did testify as to some costs of development. The essence of the defendant's complaint is that there were more and other costs reasonably attributable and that they were not taken into consideration as the defendant developed on cross-examination. The difficulty of this argument is almost apparent. It would require the upsetting of every case in which it could be developed that there were some of the multiple and various elements in the cost of developing a subdivision that were not taken into consideration by the expert witness. Our rule, and the sensible rule, is that such matters go to the weight and credibility of an expert's testimony and not to its admissibility. This argument has the further difficulty that it would require this court to became a super expert and to lay down categorically what the different elements and principles were that must be considered by an expert appraiser in using the capitalization of "income approach." This holding would be akin to requiring a doctor to perform certain tests and to use certain equipment or machines, or to make other standards, purely technical in nature, as foundation for the admission of his testimony. Such a position is, of course, untenable. And we further point out that if such an "a priori" standard should be created then the application of the different factors involved would varv from case to case and that in many cases new and additional or different factors would probably be involved or be required. This would result in a guessing contest in the trial of every condemnation case as to the admissibility of an expert witness' capitalization income testimony, even though such expert witness was properly qualified. As we have said, the trial of a law suit should

not depend upon judicial speculation as an expert witness' credibility or on an expert witness' venture into judicial credulity.

As we have pointed out herein, an expert witness may consider the quantity of a mineral in place and its unit price as a factor in determining the market value of the land at the time of the taking. Pieper v. City of Scottsbluff, *supra;* United States v. Land in Dry Bed of Rosamond Lake, *supra;* State Highway Commission v. Nunes, *supra.* It is difficult to see any difference between the unit price of a prospective sale of minerals or gravel and the unit price of the prospective use of the units remaining in place. Can it be said in fact, much less as a matter of law, that there is any less prospective stability in the one than in the other? How, then, can it be said that the movement of the soil or minerals makes it more or less a capital expenditure than the same sale of the soil or minerals remaining in place? If unit price relates to value in one, it would seem that it must necessarily follow that it relates to value in the other. In 27 Am. Jur. 2d, Eminent Domain, § 286, p. 87, it is stated as follows: "Where such income is derived from the intrinsic nature of the property itself, and not from a business conducted on the property, the courts, as a general rule, accede to the view that income from property in the way of rents and profits is an element of consideration in arriving at the market value or measure of compensation to be paid. * * * The valuation of condemned property by capitalizing the net rents is said to be an accepted method of valuation." See, also, Pieper v. City of Scottsbluff, *supra,* and cases cited therein. We are unable to find an explanation of any such distinction as to the uses of unit prices in fixing valuation between these two types of available or prospective uses in the cases discussing this proposition.

Consequently, we hold that an expert witness, otherwise properly qualified, may be permitted to use and to testify concerning the different factors affecting valua-

tion which a well-informed buyer would use in arriving at the price which he would pay for the property at the time of the taking. We hold that where land taken by eminent domain has a reasonable prospective use for recreational and subdivision purposes, this circumstance may be considered so far as it may affect the market value of the land at the time of the taking, and that part of the realty cannot be, separately valued for its prospective use for recreational and subdivision purposes as an item in addition to the market value, of the land. We hold that capitalization of income of rentals from a reasonably prospective use of the property is an acceptable method of arriving at the value of the property as a factor in the determination of its present market value, and that an expert witness may testify as to the quantity and unit price resulting from such reasonably prospective use and sale of all or part of said property.

The defendant contends that the evidence does not sustain the verdict for the Gerhold Company. The Gerhold Company lease provided for a royalty of 15 cents per cubic yard for sand, sand gravel aggregate, and overburden material removed and sold, and 18 cents per cubic yard for road gravel. The defendant produced evidence of lower royalty rates for other leases in the area and expert testimony that the fair royalty rate for that area and for Cedar Island was from 12 cents to $13\frac{1}{2}$ cents per cubic yard.

The Gerhold Company argues that the extent and quality of the gravel deposit under Cedar Island has been proven by the test wells which were drilled, and that the advantageous location of Cedar Island plus the fact that the supply of gravel in adjacent areas has been substantially exhausted, make its gravel lease on Cedar Island more valuable. The evidence shows that the cost of truck transportation is around 7 cents per cubic yard.

From our review of the record we conclude that the evidence presented a question for the jury and that it is

sufficient to sustain the verdict for the Gerhold Company.

The defendant also complains of instruction No. 12 and the form of verdict which was submitted to the jury. Instruction No. 12 advised the jury that its verdict concerning the taking of the leasehold interest "* * * will find for the plaintiff, Gerhold Company, A Corporation, and in assessing the amount of its recovery you will award to it such sum of money, if any, as you find it has proved by a preponderance of the evidence will be just compensation * * *." The verdict form followed the language of the instruction and contained a finding for the plaintiff and a blank for the amount of the recovery.

The defendant contends that the court should have permitted the jury to find for the defendant, and that the effect of the instruction and verdict form was to require the jury to award damages in some amount for the Gerhold Company.

The only issue in this case was the amount of damages, if any, that the landowner and lessee were entitled to receive from the defendant. Bushey v. French, 171 Neb. 809, 108 N. W. 2d 237, cited by the defendant, involved an issue of liability and is not in point. Instruction No. 12 contained the words "if any" and did not compel an award of damages for the Gerhold Company. We find no error in the instruction or in the form of the verdict.

The defendant complains that the Iske verdict is excessive. The plaintiff's expert witnesses testify to a range from $825,000 to $1,500,000. On the other hand, the defendant's expert witnesses testify to a range between $85,000 to $106,232. The jury verdict fell in between the two sets of conflicting expert testimony, being $510,150. The above situation is a frequent one in condemnation cases. Our court has often discussed the function of the jury in this kind of a situation. As we have pointed out, there was no error in the trial that could be asserted as properly related to an error in the

amount of the verdict. The weight and the credibility of the testimony of either lay or expert witnesses is for the jury. Expert opinion evidence, widely varying in this case, is to be considered and weighed by the triers of fact like any other testimony. The expert witnesses' testimony is purely advisory and is not binding on the triers of fact. The amount of damages sustained is peculiarly of a local nature and ordinarily is to be determined by the jury and this court will not ordinarily interfere with the verdict if it was based upon admissible testimony. When the evidence is conflicting the verdict of the jury will not be set aside unless it is clearly wrong. A landowner only has one day in court and he must recover all of his damages in this condemnation proceeding. Much of the testimony that the defendant now objects to as being incompetent was received in evidence without objection and the errors it now complains of were not specifically objected to. In this situation it ordinarily cannot complain of error with reference to an excessive verdict. The above rules of law are enunciated and promulgated in Medelman v. Stanton-Pilger Drainage Dist, *supra;* Kennedy v. Department of Roads & Irrigation, 150 Neb. 727, 35 N. W. 2d 781; Phillips Petroleum Co. v. City of Omaha, 171 Neb. 457, 106 N. W. 2d 727, 85 A. L. R. 2d 570; Connor v. State, 175 Neb. 140, 120 N. W. 2d 916; State v. Dillon, 175 Neb. 444, at pp. 452, 453, 122 N. W. 2d 223. We further point out that the defendant introduced like evidence to that it now complains of in this case as being objectionable because of an improper use of the capitalization of "income approach." It cannot now complain. A party may not successfully complain of the introduction of evidence of a like character to that which it subsequently introduced, even if it is developed on cross-examination. Johnson v. Airport Authority, 173 Neb. 801, 115 N. W. 2d 426; Tyrrell v. State, 173 Neb. 859, 115 N. W. 2d 459; Sump v. Omaha Public Power Dist., 168 Neb. 120, 95 N. W. 2d 209; Allen v. Massa-

chusetts Mutual Life Ins. Co., 149 Neb. 233, 30 N. W. 2d 885; 1 Wigmore on Evidence (3d Ed., 1940), § 18 (d) at 344; 5 C. J. S., Appeal and Error, § 1506C, p. 894; Mackie v. Hessell, 5 Mich. App. 559, 147 N. W. 2d 464.

We have examined the record and come to the conclusion that the verdict was not excessive. Among many other pertinent factors we note the following: The verdict of the jury was over $300,000 less than the minimum valuation by the plaintiff's expert witnesses. It is self-evident that it gave careful consideration to the weight and the credibility of plaintiff's expert testimony as it also did to the defendant's expert witnesses who placed a quite inadequate valuation of around $100,000 on the property. It was undisputed in the case that the whole island was underlaid with about 50 feet of the finest type of gravel; that it is the only land remaining close to the industrial part of Omaha that has large gravel deposits; that it is impervious to floods; that other gravel deposits south of Omaha have been depleted; that it is the only remaining site south of Omaha that is adaptable to industrial use requiring large volumes of high quality water; that it has accessible to it good highway, railroad, and river transportation; that this property is ideal for use for recreational lots and for subdivision purposes; that both parties introduced testimony that they had prospective use for recreational and subdivision purposes; and that such use was particularly valuable because of the development of a lake as a result of the gravel depletion. We note that the jury viewed the property and this has been given important significance in the determination of the excessiveness of a verdict in an eminent domain case. See, State v. Dillon, supra, and cases cited therein. Under these circumstances, and considering the applicable rules, this court cannot say that the verdict in this case was clearly wrong.

Other errors assigned by the defendant have been examined and have been found to be without merit.

On cross-appeal plaintiff Iske assigns as error the refusal to allow attorneys' and expert appraisers' fees under section 76-720, R. R. S. 1943. We sustain this contention. The evidence supporting this assertion was undisputed, and the defendant made no objection. No reason appears why such allowances should not have been made. While the statute says that the court "may" award such fees, it is clear that the word "may" may not be subverted to destroy the plain meaning and intent of the statute. There may, of course, be circumstances in which such an award should not be granted, but it is clear that the latitude permitted by the statute is directed primarily at the amount. See Pieper v. City of Scottsbluff, *supra*.

The judgments of the district court for plaintiffs Iske and Gerhold Company, a corporation, are affirmed. The order refusing the motion for the allowance of attorneys' and appraisers' fees is reversed and remanded.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

NEWTON, J., concurring in part and dissenting in part.

This case has been a difficult one to resolve. It has been before the court for many months and has received constant attention during that period. The opinion of White, C. J., now represents the thinking of a majority of the members of this court. I agree that the judgment obtained by the lessee Gerhold Company, a corporation, should be affirmed, but I respectfully dissent from that portion of the opinion which tends to affirm the judgment obtained by the plaintiff Iske.

The facts regarding the gravel bed found on plaintiff's property, Cedar Island, are adequately set forth in the majority opinion with the exception of the provisions contained in the Gerhold Company lease, the same being, in effect, a contract for the removal of the gravel on a royalty basis.

Evidence was received of the prevailing royalty rates paid to landowners for gravel by firms leasing properties

for the purpose of producing gravel. The plaintiff Gerhold Company, a corporation, held such a lease on Cedar Island, the island in question, providing for the payment of royalties considerably in excess of those found elsewhere in the area. At the time of the institution of this action, this company had not produced or sold any gravel from the Cedar Island site, but was engaged in preparations therefor. The Gerhold Company lease runs for 10 years, with an option for renewal for an additional 10 years. It provides for a payment of 15 cents per cubic yard for all sand, sand gravel aggregate, and overburden material removed and sold from the premises and for 18 cents per cubic yard for all road gravel removed and sold. It further provides that in the event the lessee fails to pump or excavate any materials from the leased premises for the period of 12 consecutive months, the lessor may terminate the lease and he may also terminate the lease if the lessee in any calendar year fails to produce sufficient sand and gravel to entitle the lessor to receive at least $750 in rental royalties. The lease contains no provision whatsoever for the creation of a lake as the result of any pumping activities in connection therewith.

Evidence was introduced by plaintiff showing that this site may have had possibilities as a recreation area, particularly upon any lake that might be left following completion of the gravel-mining operations. In this connection, plaintiff introduced an exhibit consisting of a plat overlaid on an aerial photograph of Cedar Island showing a perfectly formed lake and a subdivision of the area into lakefront and riverfront lots. There was also evidence of the value of such lots for rental or sale as observed on other nearby lake or riverfront areas.

Two expert witnesses testifying for plaintiff Iske fixed the market value of the island at the time of its taking at $825,000 to $925,000 and $1,500,000 respectively. They stated that they were unable to find and knew of no comparable areas which had been sold on the market in

recent years; that their opinions were, based upon all attendant factors, including the quantity of gravel that could be recovered, the royalty rate provided in the Gerhold Company contract, the possibilities of developing the area, after the removal of the gravel, into a recreation area such as was revealed by the lake and 232 lots appearing in the plat designated as exhibit 16, the value of such lots for rental and sale purposes, the possibilities of use for industrial purposes, and all other surrounding factors. The evidence revealed that such recreation development could only be completed after the gravel-mining operations had been completed which would require a minimum period of 10 to 12 years although it would be possible to take advantage of or to partially develop the site for recreational purposes as the gravel mining progressed.

Expert witnesses produced by the defendant testified to numerous sites found in the general area of Cedar Island and Omaha which had been acquired by firms engaged in the mining or production of gravel on the open market. On the basis of such sales, they gave their opinions of the market value of Cedar Island at the time of its taking. These witnesses valued the property at $85,000, $90,000, and $106,232 respectively.

It is a general rule that a landowner, in an eminent domain action, is entitled to recover the value of his property for any purpose for which it is fitted or may be used in the immediate future. See, Sump v. Omaha Public Power Dist., 168 Neb. 120, 95 N. W. 2d 209; Lybarger v. State, 177 Neb. 35, 128 N. W. 2d 132. In this instance, it appears to be generally conceded that the most advantageous use to which Cedar Island could be put would be that of gravel production. It is contended that consideration should not be given to the development of recreational possibilities because that could not be done until after the gravel had been at least partially removed from the island.

Defendant urges that the trial court erred in permit-

ting the introduction of a plat purporting to show a theoretical lake created on Cedar Island and a subdivision of the remainder of the island into 232 waterfront lots, together with the possible sale or rental value of such lots. It is said that the development of the island after the removal of the, gravel deposits for recreational purposes cannot be shown because such use was not so reasonably probable and so reasonably expected in the immediate future as to affect the market value of the land. Ordinarily any factor which affects the present market value of the property may be shown. See, 27 Am. Jur. 2d, Eminent Domain, § 280, p. 70; Pieper v. City of Scottsbluff, 176 Neb. 561, 126 N. W. 2d 865; Langdon v. Loup River Public Power Dist., 144 Neb. 325, 13 N. W. 2d 168; Papke v. City of Omaha, 152 Neb. 491, 41 N. W. 2d 751.

As a general rule: "The uses which may be considered must be so reasonably probable as to have an effect on the present market value of the land; a purely imaginative or speculative value cannot be considered. There must be a possibility considerable enough to be a practical consideration and actually to influence prices. For example, although, when a tract taken by eminent domain is used as a farm, the owner is entitled to have its possible value for building purposes considered, the jury or other tribunal is not permitted to determine how it could best be divided into building lots, nor conjecture how fast they could be sold, nor at what price per lot. The fair market value of undeveloped land immediately before condemnation is not a speculative value based on an imaginary subdivision and sales in lots to many purchasers; it is the fair market value of the land as a whole in its then state according to the purpose or purposes to which it is best adapted and in accordance with its best and highest capabilities, and it is not proper for a jury to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact." 27 Am. Jur. 2d, Eminent Domain, § 280, p. 72.

"Evidence based on conjecture and speculation is inadmissible. The owner cannot base his estimate of value on the profits which he would expect to derive from a speculative enterprise; and it is improper on the issue of market value to admit evidence showing the number of building lots into which the tract could be divided, that a witness would be willing to buy lots if the land was subdivided, what such lots would be worth separately, or the value of the property based on the value of lots shown by a preliminary plat, where such lots did not exist, although such evidence is admissible on the issue of the suitability of the tract for subdivision purposes.

"On the other hand, where use for subdivision purposes is not merely speculative and too remote to influence present market value, evidence relative to the division of the property into residential lots and its net value for such purposes after deduction of improvement costs has been held admissible, and it has been held that evidence as to the number and value of lots in a going subdivision and their kind and character is admissible; however, the possible future value if subdivision were made may not be shown. Evidence of a subdivision made after the condemnor has made entry on the land but before the institution of the condemnation proceedings is inadmissible to establish the market value of the property." 29A C. J. S., Eminent Domain, § 273 (2), p. 1196.

As may be gathered from the foregoing, a division exists among the authorities on the question of admissibility of a plat of a *proposed* but nonexistent subdivision. Some authorities hold such a plat inadmissible for any purpose. Others admit it for the sole purpose of showing the susceptibility of the land *in its existing condition* to sudivision and its adaptability to commercial or residential use. See Commonwealth v. Evans (Ky. App.), 361 S. W. 2d 766. In the present case we do not have a situation such as is ordinarily encountered dealing with a tract of land immediately adjacent to a growing municipality

which is, *in its then or existing condition at the time of the taking,* adapted to platting and to commercial or residential use. Here we are dealing with a tract which it is conceded will be very materially altered by the removal of gravel before it can be platted. There is no way to ascertain its condition after the removal of the gravel or its adaptability to platting at that time. We are dealing, not with a *reality, but with an unknown and conjectural element.* The plat is not admissible in this case for any purpose.

Although the authorities diverge on the question of admissibility of a plat of a proposed subdivision, they are almost unanimous in holding that it is improper to show the value of lots in a prospective subdivision as an element to be considered in determining value.

In the case of E. M. Kerstetter, Inc. v. Commonwealth, 404 Pa. 168, 171 A. 2d 163, it was held: "Equally improper is evidence showing how many building lots the tract under consideration could be divided into, and what such lots would be worth separately." See, also, State Highway Commission v. Deal, 191 Or. 661, 233 P. 2d 242; Barnes v. Highway Commission, 250 N. C. 378, 109 S. E. 2d 219; Northern Ind. Pub. Serv. Co. v. McCoy, 239 Ind. 301, 157 N. E. 2d 181; Thornton v. City of Birmingham, 250 Ala. 651, 35 So. 2d 545, 7 A. L. R. 2d 773; Louisiana Ry. & Nav. Co. v. Baton Rouge Brickyard, 136 La. 833, 67 So. 922.

Further evidence of the prevalence of this rule may be found in the following recent decisions: City of Medina v. Cook (1966), 69 Wash. 2d 574, 418 P. 2d 1020. See, also, City of Corpus Christi v. Polasek (Tex. Civ. App. 1966), 404 S. W. 2d 826; State, by Lord v. Kohler (1964), 268 Minn. 77, 128 N. W. 2d 90; Arkansas State Highway Comm. v. Potts (1966), 240 Ark. 506, 401 S. W. 2d 3; Redondo Beach School Dist. v. Flodine (1957), 153 Cal. App. 2d 437, 314 P. 2d 581; Arkansas Louisiana Gas Co. v. Howard (1966), 240 Ark. 511, 400 S. W. 2d 488; Arkansas State Highway Comm. v. Watkins (1958), 229

Ark. 27, 313 S. W. 2d 86; Coral-Glade Co. v. Board of Public Instruction (Fla. App., 1960), 122 So. 2d 587; State Road Comm. v. Ferguson (1964), 148 W. Va. 742, 137 S. E. 2d 206; State v. Willey (Tex., 1962), 360 S. W. 2d 524. See, also. 5 Nichols (3d Ed.), Eminent Domain, § 18.11(2), pp. 159, 160, and 161.

The majority opinion states that the *recent* cases hold contrary to the propositions mentioned on admission of plats. The foregoing rules are still the rules in effect in a majority of the jurisdictions in this country and reference to those cited is convincing of the incorrectness of the statement made in the majority opinion. It will be noted that most of the cases cited are of very recent origin.

As a general rule, the capitalization of rents and profits derived solely from the intrinsic nature of the property and not from a business conducted thereon is a valid criterion of value. See, Annotation, 65 A. L. R. 455; Annotation, 134 A. L. R. 1125. It is also a general rule that *future* income from a use to which the property could be adapted, but for which it was never used, is too uncertain to be accepted. See, Annotation, 65 A. L. R. 464; Annotation, 16 A. L. R. 2d 1113. As heretofore pointed out, the quantity and value of minerals such as gravel may be shown. This is sometimes regarded as an exception to the foregoing rules, but is not such in fact. Income derived from a sale of gravel is not a rent or profit derived solely from the intrinsic nature of the property, but is rather income derived from a sale of a capital asset, that is of the property itself. How then are these rules applicable to the capitalization of rents from prospective lots which are not only yet to be platted but yet to be created? Obviously evidence in this regard is subject to exclusion under the rule that future income from a prospective use cannot be considered as a criterion of value.

This court has held that evidence of rentals received in the past is properly admissible as a criterion of value.

In the case of Graceland Park Cemetery Co. v. City of Omaha, 173 Neb. 608, 114 N. W. 2d 29, the court stated: "We point out that a capitalization of anticipated profits is not a proper method of fixing the value of property. Whether anticipated profits would actually be made ordinarily depends on so many contingencies that a verdict cannot be grounded on them. Experience teaches us that future paper profits are more often illusory than real." In direct contradiction of this statement, the majority opinion now holds that anticipated rents and profits from the rental or sale of recreation lots are properly admissible and a proper criterion of value.

It appears that even where a piece of property is readily and immediately available for subdivision purposes, it is not permissible to show the number of lots into which it could be subdivided and the values of such lots when separately sold. In the present instance, we are dealing with an island which, in its present condition as above cited, has some slight recreational possibilities and upon which additional recreational possibilities can possibly be developed. The evidence of the plat and subdivision introduced in this case by the plaintiff Iske *assumes* the creation of a perfectly formed lake *which is now nonexistent.* There is evidence in the record that the gravel-pumping operations *may* result in the creation of a lake on this island. There is *no evidence* that a lake of this particular size and type can or will result. On the contrary, there is evidence introduced by the defendant to the effect that the formation of such a lake would not be feasible. As a direct result of the removal of the gravel, the base would be destroyed. Attention is also called to the fact that the Gerhold Company contract does not require the construction of a lake of *any type* nor does it require that the gravel be removed *within any specific period of time.* The only binding provision in the contract is that it remove sufficient gravel each year so that the royalty payment to plaintiff Iske will amount to $750. Under this provision of the contract, it is con-

ceivable that the gravel may not be removed for a period of 25 to 50 years, if then, and the contract may be subject to forfeiture or abandonment. In fact, the contract itself appears somewhat speculative in that the amount of royalty that the Gerhold Company has agreed to pay is considerably higher than that paid anywhere else in the general area and it is possible that should the lessee find that he has priced himself out of the market, he may cease operations altogether.

In the recent case of Lybarger v. State, *supra*, it was stated: " 'The evidence as to the adaptability of property for certain uses must be limited to uses reasonably anticipated in the immediate future.

" 'The adaptability for uses which may be considered must be so reasonably probable and so reasonably expected in the immediate future as to affect the reasonable market value of the land at the time the land is taken or damaged.' " Can it be said, with due consideration to logic and common sense, that the creation of a recreational area such as is evidenced by the plat in this case is either "reasonably probable" or "reasonably expected in the immediate future?"

Whether or not a satisfactory lake would result from the gravel-pumping operations and the property could be satisfactorily subdivided is entirely without foundation, theoretical, and speculative as is also the value of such lots in the somewhat distant future, particularly in view of the fact that exhibits in evidence disclose there are a considerable number of such undeveloped lakes existing in the area. It would, therefore, appear that the present case is a much more exaggerated one than those to which the foregoing rules are ordinarily applied. I conclude that this evidence was not admissible and was not a factor which could be reasonably considered by an expert witness in arriving at an opinion as to the present value of the land in question. In this case both of plaintiff's expert witnesses testified that in arriving at their estimates of value, they considered, as a material

element of such value, the recreational features evidenced by the proposed subdivision and plat. Such evidence being inadmissible, it is apparent that there was not a proper foundation for the evidence of these witnesses. The opinion of an expert witness has no probative force unless the assumptions for it are shown to be true. Blobaum v. State, 179 Neb. 304, 137 N. W. 2d 855; Cover v. Platte Valley Public Power & Irr. Dist., 167 Neb. 788, 95 N. W. 2d 117; Pueppka v. Iowa Mut. Ins. Co., 165 Neb. 781, 87 N. W. 2d 410.

In an attempt to nail down the decision arrived at in the majority opinion, the following rule followed in a few jurisdictions is mentioned: "A party may not successfully complain of the introduction of evidence, of a like character to that which it subsequently introduced, even if it is developed on cross-examination." I submit that this is entirely too broad a statement of the rule. Such a rule, so broadly interpreted, simply provides a ready vehicle for an appellate court to dispose of almost any case without regard to its merits and leads to unfairness and injustice. Were this rule to be literally interpreted, it would mean that in an eminent domain case after the plaintiff had rested, the defendant who also seeks to introduce evidence of the value of the property taken, would be deemed to have waived any error whatsoever found in plaintiff's evidence of value if he, the defendant, introduced evidence on a like subject. The rule has been altogether too broadly interpreted in a number of jurisdictions. 1 Wigmore on Evidence (3d Ed.), § 18, p. 344, states: "Another instance is the curing of an error of admission by the opponent's *subsequent use of evidence similar* to that already objected to (except where this was done merely in self-defense, to explain or rebut the original evidence)." It will be noted that Wigmore definitely qualifies the rule so that a litigant who has objected to improper evidence and whose objection has been overruled may still seek to comply with the order of the court and at the same time protect

himself by means of cross-examination and rebuttal evidence. This is still the general rule in this country where incompetent evidence is admitted over objection, and where it becomes expedient to rebut the same in order to avoid any unfair prejudice which might arise, resort may be had to the same type of objectionable evidence without waiving the original error. In re Estate of Cheney, 78 Neb. 274, 110 N. W. 731; See, also, Sayner v. Sholer, 77 N. M. 579, 425 P. 2d 743; Williams v. Dawidowicz, 209 Md. 77, 120 A. 2d 399; Standard Accident Ins. Co. v. Terrell, 180 F. 2d 1; State v. Kile, 29 N. M. 55, 218 P. 347; Smith v. State, 247 Ala. 354, 24 So. 2d 546; Hoel v. City of Los Angeles, 136 Cal. App. 2d 295, 288 P. 2d 989; Fred J. Brotherton, Inc. v. Kreielsheimer, 22 N. J. Super. 385, 92 A. 2d 57; Goodale v. Murray, 227 Iowa 843, 289 N. W. 450, 126 A. L. R. 1121; Sevener v. Northwest Tractor & Equipment Corp., 41 Wash. 2d 1, 247 P. 2d 237; Parker v. T. O. Sutton & Sons (Tex. Civ. App.), 384 S. W. 2d 433.

This judgment should be reversed and the cause remanded for a new trial insofar as plaintiff Iske's cause of action is concerned.

CARTER, J., dissenting.

The sole issue in this case is the reasonable market value of plaintiff's land at the time it was taken on August 26, 1963. It is my contention that certain evidence permitted by the trial court was inadmissible and so prejudicial as to require a new trial. I concur fully with the dissent of Newton, J., in this respect. His dissent is not only the law of this state, as the cases cited therein demonstrate, but it is reasonable and logical in its application to the peculiar facts of the case. I do not direct this dissent to the damages awarded to the Gerhold Company nor to plaintiff's claim of enhanced value because of the gravel deposits with which the land was underlaid. It is my contention that the evidence of the value of the property for recreational use after the gravel is removed is speculative, conjectural, imaginative,

and too remote, and consequently inadmissible.

I submit that the correct rule for determining the value of property taken by eminent domain is its reasonable market value at the time it is taken. Such reasonable market value includes its adaptability for some particular use which is reasonably anticipated in the immediate future. The adaptability for such use must be so reasonably probable and so reasonably expected in the immediate future as to affect the reasonable market value of the land at the time it is taken. Sump v. Omaha Public Power Dist., 168 Neb. 120, 95 N. W. 2d 209. I contend that the evidence of future use for recreational purposes is too remote in time and so speculative and conjectural in character as to make it inadmissible.

Plaintiff's land consists of 284 acres of land in and along the banks of the Platte River in Sarpy County. It includes Cedar Island which is about 1¼ miles long, containing 173 acres. This island is covered by scrub trees and brush. It is underlaid with a gravel bed approximately 50 feet in depth which has considerable commercial value. The remaining 111 acres was low riverbed land. It lay in the chute and the bed of the river. Cedar Island was subject to a gravel lease owned by the Gerhold Company. This lease was for a period of 10 years with an option to renew for a period of 10 years, and, at the end of the two 10-year leases, the lessee was to have the right to renegotiate a new lease. The lessee was given the exclusive right to pump and excavate gravel during the period of such leases. The evidence is that it would take a minimum of 12 years to remove the gravel deposits although the lessee could take up to 20 years to do so. Can it reasonably be said that a purchaser would be so influenced by the possibility of a recreational area that he would pay more than a half million dollars for the unmined gravel and the mere possibility that after 12 to 20 years a subdivision of residence lots on a nonexistent lake in a mined-out gravel pit would enhance its value? I think not.

In permitting this evidence, speculation reigns supreme, remoteness becomes telescopic nearness, and the opinions of the experts on land values tend only to give substance to unreality.

It must be presumed that this speculative, conjectural, and remote evidence contributed to the size of the verdict to the prejudice of the appellant. The trial court permitted a plat of nonexistent land, bordering a nonexistent lake, in an imagined recreational area, which could not approach reality for 12 to 20 years, if ever, to prove reasonable market value. I can find no case that will sustain the admission into evidence of such a plat. To thus convert a mined-out gravel pit into a modern recreational area by such a prophesy of the future has no standing as substantive evidence of the reasonable value of the land in 1963.

It must be borne in mind that the scheme of the recreational area testified to has no basis in fact, but is a mere possibility invented to increase the size of the verdict in this case. Can it be said that such a possible scheme after a period of 12 years is so reasonably probable and so reasonably anticipated in the immediate future as to influence its reasonable market value at the time of the taking? Can it reasonably be said that such a possible use after 20 years, the actual situation here, is so reasonably probable and so reasonably expected in the immediate future as to influence its reasonable market value? The asking of these questions points to the proper answers, to wit: An emphatic "NO."

Rules of evidence are established to insure the consideration of cases on the pertinent facts. They constitute a shield to protect against evidence that tends to prejudice a jury but which has no pertinency to the issues involved. But when such rules are given a theoretical application rather than a practical one, their purpose is thwarted and they become a sword rather than a shield. The majority opinion extends applicable rules much further than this court has even gone before by

unduly extending existing rules, by citing authorities from other states inconsistent with generally accepted rules, and by applying a theoretical construction of existing rules rather than a practical one. By this means, the majority opinion arrives at a result inconsistent with the long-established law of this state. Thus, under the guise of law, speculative, conjectural, and remote evidence is permitted to be considered by the jury and to authorize a verdict not based on the relevant and material facts. In this manner, the majority opinion stresses strained theories of the law, but gives little attention to their application to the hard, cold facts of the case. I submit that the verdict in this case can be sustained only on such approach. The gates have been swung open for the future for the admission of speculative and remote evidence and permit verdicts not based on the reasonable market value of the property at the time of taking.

The majority opinion gives lip service to the rule prohibiting speculative and remote evidence by the following quote: "However, much of the confusion can be resolved by pointing out that such evidence is inadmissible as speculative and conjectural when the only showing is that the property could be used for subdivision purposes." No statement could better fit the facts of this case. The opinion, however, disposes of the matter contrary thereto by the following conclusional statement which has no application to the facts of this case: "Where, on the other hand, as here, the use for subdivision purposes is not merely speculative and too remote to influence present market value, such evidence is admissible." Speculation, conjecture, and remoteness, as used in the rule, appear rather meaningless if it does not apply to the present case. The plan of development after the gravel has been excavated some 12 to 20 years in the future calls for the creation of a circular lake within the depleted gravel pit containing a central island connected to the outer portion of Cedar Island by a bridge to provide egress and ingress to and from 166 lakefront

lots and 66 riverfront lots, all of which is nothing more than pure speculation and conjecture. In no other way can a jury visualize a depleted gravel pit, after 20 years of gravel excavation, as the valuable residence area which the plaintiff and his witnesses prophesy. Such imagination approaches pure fantasy, and when given the semblance of reality by judicial ruling, necessarily misleads the jury and produces a verdict that is unrealistic and erroneous.

In addition to the foregoing, I submit that the verdict is not sustained by the evidence. One of plaintiff's two expert witnesses fixed the value at $1,500,000, and the other from $825,000 to $925,000. One of defendant's experts fixed the value of the land at $85,000, the second at $90,000, and the third at $106,232. The verdict of the jury was $510,150. It will be noted that no expert witness for either party valued the land within $300,000 of the jury verdict. In fact, there is no evidence of value by any witness within $300,000 of the verdict returned. The majority opinion makes the point that juries need not believe an expert witness; that their expert opinions are advisory only to the jury. Granting the correctness of this statement, what evidence remains other than the expert testimony to sustain this verdict? There is none other than that of the plaintiff who testified to the grandiose value of $2,000,000. The majority opinion, other than pointing out that the evidence of experts is advisory and not binding on the jury, does not point up the evidence that sustains this verdict. The opinion assumes that if a verdict falls within the minimum and maximum values fixed by experts, the evidence sustains the verdict no matter how unreasonable, imaginary, or illusory it may be. But this is not a rule of law, but rather, a legal cliché for sustaining a verdict when the competent evidence is in conflict and sufficient to sustain a verdict within the limits of the competent evidence. I submit that a verdict must be supported by competent evidence which is not the case here.

In my opinion the verdict is based on incompetent evidence. It is also erroneous in that it is not supported by evidence sufficient to sustain the amount of the verdict. I would reverse the judgment and remand the cause for a new trial.

BOSLAUGH, J., dissenting in part.

The expert witnesses called by the plaintiff Iske were allowed to testify as to value based upon the capitalization of income. A part of the income was to be derived from lots rented for recreational purposes.

At least one expert witness assumed that the property would be developed in accordance with a plan described by the witness Thompson. But there was no evidence to correlate the operations under the Gerhold Company lease with the development suggested by Thompson. The defendant produced evidence that the island could not be developed to conform to the Thompson plan during the production of sand and gravel. The result was that there was no adequate provision for the cost of development for recreational purposes, and a failure to consider a major cost involved in the production of the income. That part of the testimony which was based upon the capitalization of lot rentals should have been excluded.